1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID REYNOSO,

11              Petitioner,                     No. CIV S-03-0272 RRB EFB P

12        vs.

13   ANTHONY LAMARQUE, Warden,

14              Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 1998 judgment of

18   conviction entered against him in the Sacramento County Superior Court on charges of first

19   degree murder, burglary and attempted robbery.  He seeks relief on the grounds that: (1) he was

20   denied his constitutional rights pursuant to the Sixth and Fourteenth Amendments when the jury

21   was instructed that the defenses of self-defense, imperfect self-defense and the defense of others

22   did not apply in felony-murder cases; (2) the evidence was insufficient to support the jury

23   finding that petitioner and his co-defendants intended to steal from victim Godinez; (3) the

24   evidence was insufficient to support the jury finding that petitioner acted with reckless

25   indifference to human life; (4) petitioner was denied his constitutional rights to due process and a

26   fair trial when the trial court improperly admitted two "pay/owe sheets" into evidence; (5)

                                              1

petitioner was denied his constitutional rights to due process and a fair trial when the trial court admitted into evidence Joseph Cobb's statements to police; (6) petitioner was denied his constitutional right to a fair trial when the prosecutor committed misconduct during closing argument; (7) petitioner was denied his constitutional right to due process as a result of cumulative error during his trial; and (8) petitioner was denied his constitutional right to due process and a fair trial when the jury was erroneously instructed on the concept of reasonable doubt.  Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

**I.     Procedural Background**

After a jury trial, petitioner was convicted of first degree murder, burglary and attempted robbery.[1]  Clerk's Transcript on Appeal (CT) at 650-52.  The jury found true special circumstances that the murder was committed during the commission or attempted commission of a burglary and a robbery.  *Id.*  The jury also found true allegations that petitioner personally used a gun during each of the crimes.  *Id.*  Petitioner was sentenced to life without the possibility of parole plus a four-year determinate prison term.  *Id.* at 757.

Petitioner and co-defendants Avila and Cruz filed timely appeals in which they each joined in the arguments made by the others.  Answer, Exs. A, B, C.  The California Court of Appeals for the Third District affirmed all of the judgments of conviction.  Answer, Ex. H.  On June 6, 2002, petitioner filed a petition for review in the California Supreme Court, in which he joined in all issues raised by his co-defendants in their petitions for review.  Answer, Ex. I.  That petition was summarily denied by order dated July 17, 2002.  Answer, Ex. J.  Petitioner filed the instant petition for a writ of habeas corpus on March 31, 2003.

---

[1]  Petitioner was tried jointly with co-defendants Cruz Avila and Pablo Cobb.  Mr. Avila filed a petition for a writ of habeas corpus with this court on June 2, 2003, in case No. S-03-1173 RRB EFB P (hereinafter Avila habeas).  Mr. Cobb filed a petition for a writ of habeas corpus with this court on July 8, 2004, in case No. S-04-1299 RRB EFB P (hereinafter Cobb habeas). All three cases have been related in this court.

2

**II.   Factual Background**[2]

**A.  The Prosecution Case**

The victim of the crimes was 22-year-old Nick Godinez (Godinez). Godinez, his girlfriend Kristina Ramirez (Kristina), and their baby girl lived in a house on 25th Street in the south area of Sacramento.

Kristina had known the defendants – Avila, Cobb, and Reynoso – for years.  Godinez had been introduced to Avila, but not to the other defendants.  Indeed, in the first week of March 1996, Kristina and the defendants were together at a birthday party for her best friend, Gumecinda Guillen.

After 2:00 in the morning of March 6, 1996, Godinez was at home, drinking and playing a video football game in his living room with his cousin, Guillermo Mayorga (whose nickname is "Gigi"). Kristina and the baby were asleep in the master bedroom.

According to Mayorga, he and Godinez were interrupted by a loud crashing noise at the front door.  Godinez ran toward the hallway. As Mayorga got up to follow, he heard what he believed was the loud sound of a gun cocking or "racking," and a man saying, "Get the fuck on the ground.  Spread your legs. Spread your hands. Don't fucken move.  Don't turn.  Don't look.  Fucken lay down, or I'm going to fucken spray your ass."  Although Mayorga did not see who spoke, he believed there were at least two intruders. When Mayorga heard shots coming from a back room, he looked up, and seeing no one, escaped through a back door.

Kristina awoke to Godinez's shouts for her to "get down."  While Kristina shielded the baby with her body on the floor, the bedroom door was thrown open.  Kristina heard a struggle and shots on the other side of the bed, and then heard more struggling and shots in the hallway, but she could not see well enough to identify anyone. After the intruders fled, Godinez called Kristina from the entry of the house, told her that he had been shot, and asked her to call for help.  Finding her own phone dead, Kristina ran to a neighbor's house.[3]  When she returned, Godinez was lying on the entry floor

and they talked for a while.  Godinez told Kristina that he did not know who had shot him.  Godinez died on the floor.

---

[2]  This statement of facts is taken from the May 2, 2002 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 3-11, appended as Exhibit H to Respondent's Answer, filed on August 28, 2003.

[3]  Police records indicate a 911 call was placed by the neighbor at 2:27 a.m.

3

The autopsy revealed that Godinez had sustained three bullet wounds in his left upper back, which were angled sharply downward, as though Godinez was shot by someone standing above him.

A .45 caliber Randall pistol that Godinez usually kept in the master bedroom was next to him in the entry; it was jammed and inoperable.

The interior wooden casing for the front door, to which deadbolt casing and another latch had been attached, was shattered, showing the door had been broken in.

Three guns were recovered at or near the 25th Street house: a loaded nine-millimeter Taurus handgun found under the bed in the master bedroom; a loaded .25 caliber semiautomatic handgun recovered from nearby bushes; and a loaded nine-millimeter Mac 10 semiautomatic gun also recovered from a neighbor's yard.[4]

Forensic evidence established that Godinez was killed by shots fired from the Mac 10.  Expended shell casings found both inside and outside the front door were also determined to have been fired by the Mac 10.  No evidence was found that either the nine-millimeter Taurus or the .25 caliber pistol had been fired at the house.

Expended bullets and shell casings were found in the master bedroom and were determined to have been fired from Godinez's gun.

Within minutes of the arrival of emergency personnel to the 25th Street house, a nearby hospital called police to report two gunshot victims – defendants Avila and Reynoso.  Reynoso had suffered gunshot wounds to his right knee and left shoulder.  Significantly, the bullet recovered from Reynoso's knee was determined to have been shot from the Mac 10 found in Godinez's neighbor's yard.  Avila had a gunshot wound in his side.

A nurse in the emergency room, who was attending to Reynoso, reported to police that she overheard him telling Avila in a hushed, urgent voice what Avila should say to police.

Interviewed by police at the hospital, Reynoso was uncooperative and belligerent, refusing initially to give his name or any details of the shooting.  Police heard Reynoso tell Avila not to speak to the police because "the police cannot help us."  Reynoso later denied

---

[4]  The police officer who recovered the Mac 10 testified that chambering the initial round in that gun would create a "very loud, very distinctive" sound that "most people" with experience would recognize as the loading of a firearm.

1   any involvement in the shooting near 25th Street.  He instead told
    police that he had been shot while trying to buy drugs at a park,
2   when "three black guys tr[ied] to rob us."

3   The police's initial attempts to interview Avila at the hospital were
    repeatedly interrupted by Reynoso.  Although initially
4   uncooperative and reporting he had been shot while with Reynoso
    at a park, Avila later agreed to answer questions about the shooting
5   on 25th Street and conceded his involvement.  He admitted kicking
    the front door, being armed with a .25 caliber gun, and throwing
6   the gun into some bushes as he left the house.

7   Police also found Avila's driver's license in a car owned by
    Reynoso's girlfriend.  Blood was on both passenger seats.
8
    The prosecution's theory of the case was that Godinez was a drug
9   dealer from whom defendants had intended to steal drugs or cash.

10  Two slips of paper discovered by police in Godinez's kitchen were
    introduced into evidence.  The first, People's Exhibit 128, was a
11  Tower Records receipt dated March 3, 1996, bearing a list of
    handwritten entries on the reverse side:  "Dru 5,850; Dre 1,300;
12  Rovt 7,000; Gigi 3,500; T 600."  The second, People's Exhibit
    127, contained a similar series of handwritten entries:  "Dru 2,300;
13  Dre 1,400; Tre 1,400; B.B. 2,000; J 7,100; R 500; Gi 800."
    Kristina identified the signature and handwriting on Exhibit 128 as
14  Godinez's.  But she was not asked to identify the handwriting on
    Exhibit 127.  Moreover, Kristina testified that she did not know the
15  meaning of the entries on Exhibits 127 or 128, except to say that
    she recognized the entry "Gigi" on exhibit 128 as a reference to
16  Godinez's cousin Mayorga.

17  A police expert in methamphetamine trafficking testified that he
    "instantly" believed that People's Exhibits 127 and 128 were
18  examples of the "very common pay/owe sheet[s]" used by drug
    dealers to record their transactions, and that the entries on those
19  sheets suggested transactions of an "upper level" dealer, who dealt
    in pounds (not ounces) of methamphetamine.  He testified that it is
20  common not to find any narcotics at the drug dealer's residence
    because the dealers prefer to store them at a safe house.  Indeed, a
21  drug-sniffing dog detected no methamphetamine or cocaine at the
    Godinez residence, only some marijuana.
22
    Defendant Cobb's older brother, Joseph Cobb (Joseph or Joseph
23  Cobb), testified at trial.  He denied that he had ever heard
    defendants discussing Godinez.  Although Joseph admitted that he
24  might have heard from someone that Godinez "might had been

25  /////

26  /////

5

balling," he denied discussing that fact with defendants.[5]
However, in a recorded interview with police played for the jury,
Joseph had reported that Reynoso and Avila had told him that
Godinez was "balling" and selling drugs.  Joseph had also reported
that Kristina had told her friend, Gumecinda Guillen, while they
were all together at Guillen's home, that Godinez was dealing in
drugs.

A separate jury, which was empaneled to determine the allegations
against defendant Cobb alone,[6] also heard Cobb's videotaped
confession to police.  Cobb admitted learning from Reynoso that
Godinez "was a big time drug dealer.  He sold, you know, pounds
and all kinds of stuff and had all kind of money and stuff."
According to Cobb, all three defendants went to Godinez's house
intending to "lick[[7]] this baller," so that they could "get the dope
and the money."  Cobb admitted that he shot Godinez and
wounded Reynoso accidentally, while Godinez and Reynoso were
scuffling on the floor in the entry of Godinez's house.  Cobb
explained, however, that he shot Godinez only after Godinez first
shot at him.

Cobb's jury also heard evidence that after Avila and Reynoso went
to the hospital, Cobb had called his friend Oscar Norton to pick
him up from a nearby market.  Norton testified that Cobb had told
him that Avila and Reynoso had been shot when they had gone "to
go lick some dude."

**B.  The Defense Case**

Reynoso testified at trial to a different scenario than that outlined
by the prosecution.  He said that he knew Godinez well because in
the past years, Godinez had "fronted" him methamphetamine to
sell.  Reynoso stated that two years prior to the shooting, he had
received drugs to sell from Godinez – five pounds of
methamphetamine worth $20,000.  However, Reynoso never paid
Godinez because the drugs had disappeared from Reynoso's
apartment while he was in jail on an unrelated charge.

Reynoso testified that Godinez contacted him on the night of the
murder and asked him to come over "to discuss the problem we
had with the money" that Reynoso still owed him from the drugs.

---

[5]  "Balling" is slang for having a lot of money or succeeding financially.  It can also refer
to narcotics dealing.

[6]  All three defendants were tried in the same proceeding, but the action against Cobb was
tried to a separate jury in light of his pretrial confession.

[7]  To "lick" someone means to rob the person.

Reynoso explained these circumstances to Cobb and Avila. Because "there might be a problem," Reynoso asked them to accompany him to Godinez's house and to bring their guns "just in case." Avila drove the car to Godinez's house. Reynoso testified that he carried the nine-millimeter Taurus.

According to Reynoso, he went alone to Godinez's front door, knocked, and was admitted by Godinez. (But Mayorga and Kristina testified that Godinez never indicated that he was expecting Reynoso, and Mayorga testified that no one ever knocked on the door or asked to be admitted.) According to Reynoso, after Godinez closed and locked the door behind him, Godinez drew a gun and demanded: "Yeah, where's my shit now? I'm either going to get paid, or you're going to get smoked." Reynoso testified that he ran down the hallway into the master bedroom, yelling for Kristina. Reynoso and Godinez fell over each other and began wrestling for Godinez's gun when it went off. Reynoso felt himself shot in the shoulder, and his gun dropped to the floor. Reynoso saw that Godinez's gun had jammed, tried to escape, and yelled for help. Then he noticed the front door, which was open. As Reynoso neared the front door, Godinez grabbed him from behind. As the two were wrestling again on the floor, Reynoso heard some shots and felt something like a hammer hit his knee. Godinez stopped struggling, and Reynoso saw Cobb for the first time. Cobb helped him up and out of the house.

Reynoso and Cobb ran to the car. Avila was already driving. Cobb told the others that he had shot Godinez, saying, "Man, I had to do it. I had to do it."

Reynoso also admitted that he and the others had fashioned a lie to tell the police about how he and Avila had been shot because Cobb wanted them to conceal his involvement.

Cobb's mother testified on her son's behalf that Cobb was living with her in March of 1996, and that she had never before seen the Mac 10 used to shoot Godinez.

## III.   Analysis

### A.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

1          (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
2          State court proceeding.

3    28 U.S.C. § 2254(d).

4          Under section 2254(d)(1), a state court decision is "contrary to" clearly established

5    United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

6    set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

7    indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

8    result. *Early v. Packer*, 573 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

9    (2000)).

10         Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas

11   court may grant the writ if the state court identifies the correct governing legal principle from the

12   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

13   case. *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

14   that court concludes in its independent judgment that the relevant state-court decision applied

15   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

16   unreasonable."  *Id*. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not

17   enough that a federal habeas court, in its independent review of the legal question, is left with a

18   'firm conviction' that the state court was 'erroneous.'")

19         The court looks to the last reasoned state court decision as the basis for the state court

20   judgment.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a

21   decision on the merits but provides no reasoning to support its conclusion, a federal

22   habeas court independently reviews the record to determine whether habeas corpus relief is

23   available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

24         **B.  Exhaustion of State Court Remedies/Procedural Default**

25         In claim No. 4, petitioner contends that the trial court improperly allowed the admission

26   into evidence of two documents found in Godinez's residence that purportedly constituted

8

"pay/owe sheets" for drug transactions.  In claim No. 5, petitioner argues that the state court

improperly allowed the admission into evidence of Joseph Cobb's statements to police.

Respondent contends that these claims are unexhausted and may not be considered by this court.

In the alternative, respondent contends that claims 4 and 5 should be denied on the merits

pursuant to 28 U.S.C. § 2254(d)(2).

### 1. __Background__

On appeal, petitioner raised several distinct claims and also joined in all appellate

arguments made by co-defendants Avila and Cobb.  Answer, Ex. B at 56.  Petitioner's claim No.

4 contained in the instant petition was raised by co-defendant Avila on direct appeal and joined

in by petitioner in his state court appeal.  Answer, Ex. A at 23.  Avila argued that the trial court

committed evidentiary error when it admitted into evidence the two "pay/owe sheets," which

allegedly "suffered from hearsay and foundational defects."  *Id.*  Avila contended that because

the trial court's evidentiary ruling "allowed a prosecution expert witness to opine the paper

scraps were a drug dealer's 'pay and owe sheets' and extrapolate that Godinez was a large scale

drug dealer handling thousands of dollars in cash, it unfairly supplied the prosecution with a

motive for the burglary and robbery charged as special circumstances."  *Id.*  Avila's argument in

this regard was based solely on state law regarding the rules of evidence.  *Id.* at 23-39.  Avila did

not cite federal law or articulate a federal constitutional claim.  *Id.*  In its opinion rejecting

Avila's evidentiary claim, the California Court of Appeal cited only state law.  Answer, Ex. H at

36-39.[8]

////

---

[8]  In his brief, Avila noted that he had filed a motion in limine in the trial court "under state statutory and state and federal constitutional grounds" to exclude these two documents from evidence.  Answer, Ex. A at 23.  However, petitioner did not raise a federal constitutional argument in his state appellate brief.  The court notes, in this regard, that pages 37-39 are missing from the relevant portion of Avila's opening brief in all of the related cases filed in this court.  *See* Pet., Ex. A; Cobb habeas, Ex. C; Avila habeas, Ex. A.  However, it appears from the pages that were filed that Avila did not cite any federal cases or argue any federal constitutional claim in support of his evidentiary argument on appeal.

1    Avila subsequently filed a petition for review in the California Supreme Court, in which

2    he raised, for the first time, a claim that the state court's evidentiary ruling violated the federal

3    due process clause.  Answer filed in Avila habeas, Ex. I. at 6.  Petitioner also filed a petition for

4    review, in which he joined in all claims made by Avila in his petition for review.  Answer, Ex. I

5    at 19.

6    Petitioner's claim No. 5 contained in the instant petition was also raised by co-defendant

7    Avila on direct appeal and joined in by petitioner.  Answer, Ex. A at 40-50.  Again, Avila cited

8    only state cases in support of this claim, arguing that the trial court's evidentiary error in

9    allowing Joseph Cobb's statements into evidence violated state rules regarding the admissibility

10   of evidence.  *Id.*  In its opinion rejecting Avila's evidentiary claim, the California Court of

11   Appeal did not cite federal law or address any federal constitutional issues.  Answer, Ex. H at

12   39-42.

13   Avila subsequently filed a petition for review in the California Supreme Court, in which

14   he raised, for the first time, a claim that the trial court's evidentiary error in allowing into

15   evidence the statements of Joseph Cobb violated his federal due process rights.  Answer filed in

16   Avila habeas, Ex. I at 12-15.  Petitioner joined in this argument in his own petition for review.

17   Answer, Ex. I at 19.  The California Supreme Court summarily denied both petitioner's and

18   Avila's petitions for review.  Answer, Ex. J; answer filed in Avila habeas, Ex. J.

19          **2.    Exhaustion**

20   Respondent argues that petitioner has failed to exhaust claims 4 and 5 contained in the

21   instant petition because they were raised for the first time in a petition for discretionary review

22   filed in the California Supreme Court and not in a lower state court.  Generally, a state prisoner

23   must exhaust all available state court remedies either on direct appeal or through collateral

24   proceedings before a federal court may consider granting habeas corpus relief.  28 U.S.C.

25   § 2254(b)(1).  A state prisoner satisfies the exhaustion requirement by fairly presenting his claim

26   to the appropriate state courts at all appellate stages afforded under state law.  *Baldwin v. Reese*,

1    541 U.S. 27, 29 (2004); *Casey v. Moore*, 386 F.3d 896, 915-16 (9th Cir. 2004), *cert. denied*, 125

2    S.Ct. 2975 (2005).

3           In *Castille v. Peoples*, 489 U.S. 346, 351 (1989), the United States Supreme Court held

4    that "where the [federal] claim has been presented for the first and only time in a procedural

5    context in which its merits will not be considered unless there are special and important reasons

6    . . . [r]aising the claim in such a fashion does not . . . constitute fair presentation."  The Ninth

7    Circuit has interpreted *Castille* to stand for the proposition that a petitioner fails to exhaust a

8    federal claim if she or he seeks review of the claim for the first time on discretionary appeal in

9    state court.  *Casey*, 386 F.3d at 918 (petitioner did not exhaust his federal claims where they

10   were raised for the first and only time in a discretionary petition for review to the Washington

11   State Supreme Court).

12          A petition for review to the California Supreme Court is a discretionary appeal.  *See* Cal.

13   Rules of Court, Rule 8.500(b).  Because petitioner raised claims 4 and 5 for the first time in a

14   discretionary appeal to the California Supreme Court, he has failed to exhaust those claims for

15   purposes of the federal habeas corpus statute.  *Castille*, 489 U.S. at 351; *Casey*, 386 F.3d at 918.

16   However, as set forth below, notwithstanding the exhaustion requirement, this court will

17   recommend that petitioner's claims 4 and 5 be denied on the merits.  *See* 28 U.S.C. § 2254(b)(2)

18   ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the

19   failure of the applicant to exhaust the remedies available in the courts of the State"); *Cassett v.*

20   *Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may

21   deny an unexhausted claim on the merits when it is perfectly clear that the claim is not

22   "colorable").[9]

23   ////

24   ////

25

26          [9] In order to be colorable, a claim must have both legal and factual support.  *Beaudry*
     *Motor Co. v. Abko Properties, Inc.*, 780 F.2d 751, 756 (9th Cir. 1986).

### 3. **Procedural Default**

When a state prisoner fails to exhaust his federal claims in state court and the state court would now find the claims barred under applicable state rules, the exhaustion requirement is satisfied, but the federal claims are procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Casey*, 386 F.3d at 920. Similarly, if a federal constitutional claim is expressly rejected by a state court on the basis of a state procedural rule that is independent of the federal question and adequate to support the judgment, the claim is procedurally defaulted. *Coleman*, 501 U.S. at 729-30; *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003). Habeas review of procedurally defaulted claims is barred unless the petitioner demonstrates cause for the procedural default and actual prejudice, or that the failure to consider the claims will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. Respondent argues that petitioner's claims 4 and 5 are procedurally barred because "it is fair to assume" that the California Supreme Court denied these two claims on procedural grounds.

As a policy matter, on petition for review the California Supreme Court normally "will not consider" an issue that the petitioner failed to timely raise in the Court of Appeal. Cal. Rules of Court, Rule 8.500(c)(1). As noted above, the California Supreme Court denied petitioner's claims without opinion or citation to authority. Accordingly, it is not possible to determine whether, as argued by respondent, the claim was "denied" for procedural reasons or whether, according to policy, the Supreme Court did not "consider" the claim at all. This court will not attempt to divine the reasons behind the state Supreme Court's summary rejection of petitioner's claims, nor will it declare a procedural default where the state court has failed to indicate that a claim has been rejected on procedural grounds. In addition, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim where the default issue turns on difficult questions of state law. *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997); *see also Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004). Under the circumstances presented here, this court finds that petitioner's claims 4 and 5 can be resolved

1    more easily by addressing them on the merits.  Accordingly, this court will assume that

2    petitioner's claims are not defaulted and will address them on the merits.

3        **C.  Petitioner's Claims**

4            **1.  <u>Jury Instruction Error</u>**

5            Petitioner raises two claims of jury instruction error.  After setting forth the applicable

6    legal principles, the court will evaluate these claims in turn below.

7                    **a.  <u>Legal Standards</u>**

8            In general, a challenge to jury instructions does not state a federal constitutional claim.

9    *See Middleton* v. *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S.

10   107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant

11   federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or

12   even "universally condemned,"' but must violate some due process right guaranteed by the

13   fourteenth amendment."  *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting

14   *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).  To prevail on such a claim, petitioner must

15   demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting

16   conviction violates due process.'"  *Prantil*, 843 F.2d at 317 (quoting *Darnell v. Swinney*, 823

17   F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the

18   challenged jury instructions "'in the context of the overall charge to the jury as a component of

19   the entire trial process.'"  *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).

20               **b.  <u>Failure to Instruct on Self-Defense (Claim No. 1)</u>**

21           In claim No. 1, petitioner asserts that he was denied his constitutional rights

22   pursuant to the Sixth and Fourteenth Amendments when his jury was instructed that "the

23   defenses of self-defense, unreasonable belief in self-defense, or the defense of others, did not

24   apply in determining the felony murder special circumstances."  Pet. at 5A.  Petitioner concedes

25   that a jury instruction on self-defense is not applicable to a charge of felony-murder because

26   malice is imputed to persons who commit homicide during the perpetration of a dangerous

13

felony.  *Id.*  However, he claims that the instruction should have been given with respect to the underlying robbery and burglary special circumstance allegations because those crimes "do require that a mental state of reckless indifference to human life, which is tantamount to implied malice, be shown."  *Id.*  Petitioner notes that he was not the person who fired the fatal shots at the victim and argues that "he, as a non killer did not possess the required state of mind."  *Id.*  Petitioner contends that "unlike the actual killer, the state of mind of a (non killer) major participant in the underlying felony must possess an 'intent to kill' or exhibit the conduct of reckless indifference to human life."  *Id.*

Petitioner's jury received the following instructions:

> The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of burglary or robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime.

CT at 460.

> If you find a defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances is true or not true: 1. that the murder was committed by defendants while engaged in the crime of burglary (Penal Code § 190.2(a)(17)(vii)) or 2. that the murder was committed by defendants while engaged in the commission or attempted commission of a robbery.

> If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree, or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of burglary, robbery, or attempted robbery which resulted in the death of a human being, namely Nicholas Godinez.

*Id.* at 478.

////

14

1
2

> The special circumstance referred to in these instructions is not established if the burglary, robbery or attempted robbery was merely incidental to the commission of the murder.

3   *Id.* at 481.

4
5
6
7
8

> The concepts of lawful self-defense, lawful defense of others and mitigation of homicide due to an actual but unreasonable belief in the need to defend onesself do not apply if you should find that an unlawful killing was committed during the course of the commission of a felony such as burglary, robbery or attempted robbery. Those defenses only apply in cases of homicide allegedly committed on a theory other than by way of the felony-murder doctrine.

9   *Id.* at 474.

10   In his state court appeal, petitioner argued that the trial court erred in informing the jury

11   that the instruction on self-defense did not apply to the charge of felony murder because "self-

12   defense could affect whether the robbery or burglary was incidental to the murder."  Opinion at

13   58.  The California Court of Appeal rejected this argument with the following reasoning:

14
15
16
17

> To the contrary, self-defense could not affect whether the robbery or burglary was incidental to the murder:  Even if the decision to commit an armed burglary or robbery resulted in a homicide owing to the victim's excessive resistance (thus purportedly invoking the theory of self-defense), the killing would still be incidental to the commission of the burglary or robbery.

18   *Id.*

19   Petitioner also argued on appeal that "the jurors should have been instructed that they

20   could consider the application of the self-defense and defense-of-others theories for the limited

21   purpose of 'mitigating' the mental state required for a finding of special circumstances by

22   'negat[ing] the conclusion [that] a person who kills, even during the commission of a felony, acts

23   in reckless disregard of human life."  *Id.*  The state appellate court rejected that argument as

24   follows:

25
26

> But defendants' reckless indifference to life within the meaning of section 190.2, subdivision (d), could not be mitigated simply because they "defended" against the victim's resistance to their

1
2
3
4
5
6

> felonies.  After all, such a defense would not alter the fact that
> defendants arrived at the residence armed and with the intent to
> commit felonies, that Avila kicked down the front door, and that
> they left Godinez to bleed to death from his wounds.  This showed
> a reckless indifference to life, regardless of whether the victim
> resisted their attempted felonies with deadly force.  Further, a
> person does not have the right to provoke an armed quarrel and
> then assert self-defense to justify a homicide, unless he or she has
> first, in good faith, declined further combat and fairly notified the
> opponent that he or she had abandoned the affray.  (*People v. Holt,
> supra,* 25 Cal.2d at p. 66.)  And there was no evidence of that.

7    *Id.* at 59.  The appellate court also noted that "there is no statutory or case authority for

8    [petitioner's] contention, while there is some authority to the contrary."  *Id.*

9    The decision of the California Court of Appeal rejecting petitioner's jury instruction

10   claim is not an unreasonable application of the federal due process principles set forth above and

11   may not be set aside.  Petitioner has not cited any United States Supreme Court case holding that

12   the failure of a state trial court to instruct a jury that a defense of self-defense is applicable to a

13   charge of felony-murder, or the special circumstance allegations attached thereto, violates a

14   defendant's right to due process.  Further, as explained by the state appellate court, an

15   instruction on self-defense was largely irrelevant to, and would have had no significant bearing

16   on the issues to be decided by the jury regarding the charge of felony murder.  Even if petitioner

17   and his co-defendants acted to protect themselves (i.e., in "self-defense") in response to

18   Godinez's actions, the jury could still find that the shooting was committed while petitioner and

19   his co-defendants were engaged in the crimes of burglary or robbery and that they acted with

20   reckless disregard for human life when they went to Godinez' house in the middle of the night

21   with loaded guns, kicked in the door and entered the house with the intent to steal.  As explained

22   by the state court, the motivation for the shooting in this case is irrelevant to the charge of felony

23   murder, especially when petitioner and his co-defendants created the dangerous situation in the

24   first place.  Under the circumstances of this case, the trial court's instruction that the defense of

25   self-defense did not apply to the charge of felony-murder did not render petitioner's trial

26   fundamentally unfair or otherwise violate his constitutional rights.  Accordingly, petitioner is not

1    entitled to relief on this claim.

2                       **c.   Instruction on Reasonable Doubt (Claim No. 8)**

3             In claim No. 8 petitioner also alleges that he was denied his constitutional right to

4    due process and a fair trial when the jury was erroneously instructed on the concept of

5    reasonable doubt.  Pet. at 5F.

6             The jury in this case was instructed with the current version of CALJIC No. 2.90,

7    which provides, in relevant part, as follows:

8                       Reasonable doubt is defined as follows:  It is not a mere possible
                        doubt; because everything relating to human affairs is open to
9                       some possible or imaginary doubt.  It is that state of the case
                        which, after the entire comparison and consideration of all the
10                      evidence, leaves the minds of the jurors in that condition that they
                        cannot say they feel an abiding conviction of the truth of the
11                      charge.

12   CT at 441.

13                      Prior to its modification in 1994, the instruction stated in relevant part:
                        Reasonable doubt is defined as follows:  It is not a mere possible
14                      doubt; because everything relating to human affairs, **and
                        depending on moral evidence**, is open to some possible or
15                      imaginary doubt.  It is that state of the case which, after the entire
                        comparison and consideration of all the evidence, leaves the minds
16                      of the jurors in that condition that they cannot say they feel an
                        abiding conviction, **to a moral certainty**, of the truth of the
17                      charge.

18   (Emphasis added).  In *Victor v. Nebraska*, 511 U.S. 1 (1994), the United States Supreme Court

19   upheld the constitutionality of this pre-1994 instruction, but criticized the use of the terms

20   "moral evidence" and "moral certainty."  *Id.* at 10-14.  Subsequent to the decision in *Victor*, the

21   California Supreme Court suggested that the instruction should be revised to delete the terms

22   "moral evidence" and "moral certainty" in order to prevent future convictions from being

23   reversed on the basis of the instruction.  In this regard, the California Supreme Court stated:

24                      "A slight modification in view of (the *Victor*) decision might be
                        deemed safe, indeed safer than not making it.  The high court made
25                      clear that the terms "moral evidence" and "moral certainty" add
                        nothing to the jury's understanding of reasonable doubt.  It thus
26                      seems that trial courts might, in the future, safely delete the

                                                17

following phrases in the standard instruction:  "and depending on moral evidence," and "to a moral certainty."

*People v. Freeman*, 8 Cal. 4th 450, 504 (1994).  CALJIC No. 2.90 was subsequently revised accordingly, and it is the revised instruction that was given to petitioner's jury.

Petitioner's challenge to CALJIC No. 2.90 has been explicitly rejected by the Ninth Circuit Court of Appeals and is therefore unavailing.  *See Lisenbee v. Henry*, 166 F.3d 997, 999 (9th Cir. 1999).  Moreover, in state criminal trials, the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  "[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Victor*, 511 U.S. at 5  (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954) (internal citation omitted)).  In evaluating the constitutionality of a jury charge such as this one, a court must determine "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor*, 511 U.S. at 6.  *See also Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998).

Petitioner has failed to demonstrate a reasonable likelihood that the jury understood the instructions given at his trial either to suggest a standard of proof lower than due process requires or to allow conviction on factors other than the prosecution's proof.  Reviewing the instructions in their entirety, this court finds no reasonable likelihood that the jury misunderstood the government's burden of proving guilt beyond a reasonable doubt.  In addition to being given CALJIC 2.90, the jury was instructed that they "must determine what facts have been proved from the evidence received in the trial and not from any other source."  CT at 409  The jury was also instructed that they could not find petitioner guilty based on circumstantial evidence "unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent or mental state, but (2) cannot be reconciled with any other rational

conclusion." *Id.* at 418.  Finally, the jury was told that the prosecution had the burden "of

proving [petitioner] guilty beyond a reasonable doubt." *Id.* at 441.  These instructions, along

with CALJIC 2.90, adequately informed the jury of the prosecution's burden to prove the case

against petitioner beyond a reasonable doubt based on an analysis of the totality of the evidence

introduced at trial.  The Supreme Court has held that "[a]n instruction cast in terms of an abiding

conviction as to guilt, without reference to moral certainty, correctly states the government's

burden of proof." *Victor*, 511 U.S. at 14.

This court concludes that the modified CALJIC 2.90 was a reasonable response to the

Supreme Court's decision in *Victor*.  Further, taken as a whole, the instructions correctly

conveyed the concept of reasonable doubt to the jury.  *Lisenbee*, 166 F.3d at 999; *Ramirez*, 136

F.3d at 1214.  Petitioner has failed to demonstrate that the state court's decision upholding the

constitutionality of this jury instruction was contrary to, or involved an unreasonable application

of federal law.  Accordingly, relief as to this claim must be denied.

## 2.  Sufficiency of the Evidence

Petitioner raises two claims regarding the sufficiency of the evidence at his trial.  After

setting forth the applicable legal principles, the court will analyze these claims in turn below.

### a.  Legal Principles

The Due Process Clause of the Fourteenth Amendment "protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime with which he is charged." *Winship*, 397 U.S. at 364.  There is sufficient evidence to

support a conviction if, "after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  *See also Prantil*,

843 F.2d at 316.  "[T]he dispositive question under *Jackson* is 'whether the record evidence

could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373

F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).  A petitioner in a federal

1  habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the

2  evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*,

3  408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).  In order to grant the writ, the habeas court

4  must find that the decision of the state court reflected an objectively unreasonable application of

5  *Jackson* and *Winship* to the facts of the case.  *Id.*

6      The court must review the entire record when the sufficiency of the evidence is

7  challenged in habeas proceedings.  *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

8  *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987).  It is

9  the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

10 reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  If the trier

11 of fact could draw conflicting inferences from the evidence, the court in its review will assign

12 the inference that favors conviction.  *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994).  The

13 relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

14 the jury could reasonably arrive at its verdict.  *United States v. Mares*, 940 F.2d 455, 458 (9th

15 Cir. 1991).  "The question is not whether we are personally convinced beyond a reasonable

16 doubt.  It is whether rational jurors could reach the conclusion that these jurors reached."

17 *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines the

18 sufficiency of the evidence in reference to the substantive elements of the criminal offense as

19 defined by state law.  *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

20                **b.  <u>Intention to Steal from Godinez (Claim No. 2)</u>**

21      In claim No. 2, petitioner asserts that the evidence was insufficient to support the jury

22 finding that he and his co-defendants intended to commit burglary or robbery when they entered

23 the victim's house and, accordingly, the jury findings of special circumstances and his

24 convictions for burglary and attempted robbery must be set aside.  Pet. at 5B.

25      The California Court of Appeal rejected petitioner's claim in this regard, reasoning as

26 follows:

To sustain a burglary conviction, we ask whether the jury could reasonably determine that the defendant possessed the intent to commit a felony at the time of entering the dwelling. (*See People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 166; §459 [burglary elements include "intent to commit grand or petit larceny or any felony"].) A defendant's intent however, is rarely susceptible of direct proof and must usually be inferred from all of the facts and circumstances disclosed by the evidence. When the evidence justifies a reasonable inference of felonious intent, the verdict will not be disturbed on appeal. (*People v. Holt* (1997) 15 Cal.4th 619, 669-670; *People v. Cain* (1995) 10 Cal.4th 1, 47.)

The facts here justify the jury's inference that Reynoso and Avila acted with an intent to steal from Godinez. First, they believed that Godinez had money or drugs. This belief could be based on Reynoso's testimony that Godinez had given him $20,000 worth of drugs to sell in the past; by Joseph's testimony that Reynoso and Avila had said that Godinez was selling drugs; and by the discovery of the pay/owe sheets at the 25th Street house. Second, Reynoso and Avila armed themselves and went to Godinez's house in the middle of the night – hardly the time to discuss an overdue debt, as Reynoso claimed. There, they kicked Godinez's front door open, and one of them yelled for Mayorga and/or Godinez to lay on the floor and hold still – conduct clearly consistent with a burglary or theft and inconsistent with a visit to discuss an overdue debt. Fourth, Mayorga testified that Godinez did not mention that he was expecting anyone, and the first sign of the "visit" was a crashing noise at the front door. These facts support the jury's conclusion that Reynoso and Avila intended to steal from Godinez.

The fact that there was no evidence that defendants in fact removed anything from Godinez's residence does not alter this conclusion in light of the fact that Reynoso and Avila were wounded in the ensuing gun fight, which obviously aborted their plan to find money or drugs. Further, an expert explained that upper-level drug dealers would not keep narcotics at their residences.

Case authority amply supports the propriety of the jury's inference here. "Burglarious intent can reasonably be inferred from an unlawful entry alone. [Citations.] Even if no crime be committed after the entry, circumstances such as flight after being hailed by an occupant of the building . . . without reasonable explanation of the entry, will warrant the conclusion by a jury that the entry was made with the intention to commit theft." (*People v. Jordan* (1962) 204 Cal.App.2d 782, 786-787; *People v. Martin* (1969) 275 Cal.App.2d 334, 339 [same]; *see also People v. Jones* (1962) 211 Cal.App.2d 63, 71-72 ["Burglarious entry may be inferred from the fact that appellant unlawfully and forcibly entered the home of another"]; *People v. Fitch* (1946) 73 Cal.App.2d 825, 827 [intent to commit theft "could be inferred from the forcible and unlawful

1          entry alone"].)  Accordingly, defendants' unlawful and violent
           entry here warranted a conclusion of felonious intent for purposes
2          of the burglary convictions.

3          Turning to the robbery allegations, the same reasoning compels us
           to reject defendants' argument that the evidence was insufficient to
4          support their convictions for attempted robbery and the jury's
           finding of special circumstances based on robbery.  Because there
5          was evidence that Reynoso and Avila believed that Godinez was a
           wealthy drug dealer, that they armed themselves, that they kicked
6          open Godinez's front door in the middle of the night, and that they
           threatened Godinez or Mayorga to "fucken lay down, or I'm going
7          to fucken spray your ass," the jury could reasonably have inferred
           that defendants intended to take money or drugs from Godinez
8          "against his will . . . by force or fear" within the meaning of the
           statutory definition of robbery.  (§211)  The contention to the
9          contrary is meritless.

10   Opinion at 42-45.

11          As described by the California Court of Appeal, in order to find petitioner guilty of

12   burglary the jury was required to make a reasonable determination from the evidence that

13   petitioner possessed the intent to commit grand or petit larceny or any felony at the time he

14   entered the victim's house.  *Id.* at 43.  To find petitioner guilty of robbery, the jury was required

15   to find that petitioner intended to take "personal property" (in this case, either money or drugs)

16   from Godinez against his will "by force or fear."  *Id.* at 45; Cal. Pen. Code § 211.  There was

17   sufficient evidence introduced at petitioner's trial to enable the jury to make these findings.  For

18   the reasons explained by the Court of Appeal, the jury could reasonably infer from the trial

19   testimony that petitioner and his co-defendants knew Godinez was a drug dealer and that they

20   intended to steal either money or drugs from Godinez when they broke down the door to his

21   house and confronted him with guns.

22          Petitioner notes that the prosecution did not rely on a theory that he and his co-defendants

23   entered Godinez's residence with the intent to "assault or kill."  Pet. at 5B.  To the extent that

24   petitioner is arguing the trial evidence was more amenable to this theory, the argument is

25   rejected.  The fact that the trial evidence may have given rise to a finding that petitioner intended

26   to assault or kill Godinez when he broke into his house, rather than intending to steal from him,

1   is not dispositive of this claim.  Notwithstanding any evidence to support a different theory of

2   culpability, there was substantial evidence from which a rational trier of fact could have found

3   beyond a reasonable doubt that petitioner was guilty of intent to commit burglary and robbery

4   when he entered Godinez's residence.  Because there was substantial evidence presented at trial

5   to support petitioner's conviction on these charges, the state court's analysis of this claim is not

6   "objectively unreasonable."  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).  *See also* 28

7   U.S.C. § 2254(d)(1).  Indeed, it is quite reasonable.  Accordingly, petitioner is not entitled to

8   relief on this claim.

9                       **c.  Reckless Indifference to Life (Claim No. 3)**

10           In claim No. 3, petitioner claims that the jury improperly found the two special

11   circumstance allegations true because the evidence was insufficient to support the jury finding

12   that he acted with reckless indifference to human life.  Petitioner notes that he was not the person

13   who shot Godinez and states that he merely "participated in the burglary while armed."  Pet. at

14   5C.

15           This claim was rejected by the California Court of Appeal with the following reasoning:

16           The circumstances in which an accomplice to felony murder may
             be subjected to life imprisonment without the possibility of
17           parole, which requires a "reckless indifference to human life," are defined
             in section 190.2, subdivision (d): "[E]very person, not the actual
18           killer, who, with reckless indifference to human life and as a major
             participant, aids, abets, counsels, commands, induces, solicits,
19           requests, or assists in the commission of a felony enumerated in
             paragraph (17) of subdivision (a) which results in the death of
20           some person or persons, and who is found guilty of murder in the
             first degree therefor, shall be punished by death or imprisonment in
21           the state prison for life without the possibility of parole if a special
             circumstance enumerated in paragraph (17) of subdivision (a) has
22           been found to be true . . . ."  Among the special circumstances
             enumerated in subdivision (a), paragraph 17, are that the murder
23           was committed while the defendant was an accomplice in the
             commission or attempted commission of first degree robbery
24           (§190.2, subd. (a)(17)(A) or first degree burglary (190.2, subd.
             (a)(17)(G).)

25
             Defendants do not dispute that they were "major participants"
26           within the meaning of §190.2, subdivision (d).  Rather, they argue

that "merely committing an armed burglary or robbery should not be sufficient to infer a defendant acted with reckless indifference to life."

The portion of the relevant statutory language in section 190.2, subdivision (d), is derived verbatim from the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127] (*Tison*). "In *Tison*, the court held that the Eighth Amendment does not prohibit as disproportionate the imposition of the death penalty on a defendant convicted of first degree felony murder who was a 'major participant' in the underlying felony, and whose mental state is one of 'reckless indifference to human life.' (*Tison*, *supra*, 481 U.S. at p. 158, fn. 12 [95 L.Ed.2d at pp. 144-145].) The incorporation of *Tison's* rule into section 190.2(d) – in express terms – brought state capital sentencing law into conformity with prevailing Eighth Amendment doctrine. [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 575.)

The defendants in *Tison* were two brothers who "orchestrated the prison escape of their father and his cellmate, arming themselves, a third brother, and the two convicted murderers with guns while still inside prison walls, and assisting in the escapees' flight after the breakout. When a tire on the group's getaway car went flat on the highway, one of the defendants flagged down a passing motorist for help. Both of the defendants participated in the kidnapping and robbery of the occupants of the stopped vehicle, and were nearby when their father and his cellmate shot and killed the four victims." (*People v. Estrada, supra*, 11 Cal.4th at p. 576, citing *Tison, supra*, 481 U.S. at pp. 139-141 [95 L.Ed.2d at pp. 132-134[.)

The Court in *Tison* reasoned that "some nonintentional murderers may be among the most dangerous and inhumane of all – the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.'" (*Tison, supra,* 481 U.S. at p. 157 [95 L.Ed.2d at p. 144].) Thus, "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state." (*Id.* at p. 157 [95 L.Ed.2d at p. 144].)

Following *Tison*, California courts have concluded that a defendant may be said to act with "reckless indifference to life" within the meaning of section 190.2, subdivision (d), if he "'knowingly engag[es] in criminal activities known to carry a grave risk of death' (citation)." (*People v. Estrada, supra*, 11 Cal.4th at p. 577.) In *People v. Estrada, supra*, 11 Cal.4th at p. 578, our Supreme

24

Court made clear that "reckless indifference to human life" as used in section 190.2, subdivision (d), means the "defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony."

Substantial evidence established that Avila and Reynoso were subjectively aware of the grave risk to human life created by their participation in the underlying felony:  Believing Godinez to be a drug dealer, they sought to rob him; they armed themselves; each joined his armed companions in the invasion of Godinez's home in the middle of the night; one of them threatened Mayorga or Godinez to "[f]ucken lay down, or I'm going to fucken spray your ass"; Avila kicked in Godinez's front door for the purpose of stealing drugs or money; and after Godinez was shot, they left Godinez to bleed to death from his wounds and did not call for help.

Moreover, if defendants believed that Godinez had enough drugs and money worth stealing, they must have appreciated that Godinez would likely be armed and willing to defend himself, increasing the likelihood of gunfire in which an innocent person might be killed.  (*See Tison, supra*, 481 U.S. at pp. 150-151 [95 L.Ed.2d at p. 140] ["Participants in violent felonies like armed robberies can frequently 'anticipat[e] that lethal force . . . might be used . . . in accomplishing the underlying felony'"]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 ["[d]efendant admitted planning to go to a drug dealer's home at night to rob him . . . . Defendant had to be aware of the risk of resistance to such an armed invasion of the home and the extreme likelihood death could result"].)

Defendants argue that "the sudden invasion in the present case by three men would decrease the likelihood of resistance because of the overwhelming use of force" and that "the entry into a home suddenly, as in this case, with guns ready can decrease the risk of death as is a common reason police officers enter houses in this fashion."

To the contrary, that defendants embarked upon this home-invasion-style robbery attempt in the middle of the night increased the likelihood of confusion; the darkness made it more likely that an innocent person would be hurt, including Kristina (whom defendants knew) and her daughter.  Defendants cannot compare the risks associated with the illegal use of force with the police's legal exercise of force; there are rules of engagement that reduce the necessary risk of casualties from police work that are not observed by criminals, and the police have special training that defendants do not suggest they had.  Defendants' armed surprise invasion of a residence in the middle of the night of someone who they had to suspect would be armed created a grave risk.

25

The case law also suggests that the defendants' failure to come to Godinez's aid after the shooting supports the conclusion that they acted with reckless indifference to life. (*See Tison, supra,* 481 U.S. at p. 152 [95 L.Ed.2d at pp. 140-141] [defendant Ricky Tison "watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims"]; *People v. Mora, supra,* 39 Cal.App.4th at p. 617 [defendant "did not attempt to aid the victim but instead carried through with the original plan to steal the victim's drugs].)

Evidence at trial established that Godinez lived for a while after the shooting, and that he may also have been able to walk. From this, the jury could reasonably have concluded that had defendants helped Godinez or called for help instead of running away, Godinez might not have died. Defendants' flight and failure to aid Godinez provide additional evidence that they were recklessly indifferent to whether he lived or died.[10]

Reynoso contends that "[t]he circumstances of leaving the victim dying is different in the present case because it is undisputed both Reynoso and Avila were seriously wounded and immediately went to the hospital." But their reckless disregard for the life of Godinez is reflected in their false statements and refusal to cooperate with the police about what had happened, instead of advising police of the wounded victim.

In sum, substantial evidence supports the jury's finding that Avila and Reynoso acted with reckless indifference to human life.

Opinion at 46-51.

The decision of the California Court of Appeal that sufficient evidence supported the jury's finding that petitioner acted with reckless indifference to human life is not unreasonable and may not be set aside. As noted by the state appellate court, petitioner invaded Godinez's home armed with a gun, knowing that Godinez was probably armed and would attempt to defend himself. Under those circumstances, it was extremely likely that someone would be injured or killed. Indeed, it is difficult to think of a situation more fraught with danger. Petitioner has

---

[10] Several cases focus for their analysis of whether a defendant acted with reckless indifference to life upon his willingness to take the money and run, leaving an injured victim in his wake. (citations omitted.) However, these cases do not suggest (as defendants argue) that a defendant who *leaves* the money and runs cannot be found to have acted with a reckless indifference to life.

failed to demonstrate that the decision of the state court was contrary to or an unreasonable

application of federal law.  Accordingly, petitioner is not entitled to relief on this claim.

### 3. Evidentiary Error

#### a. Pay/Owe Sheets (Claim No. 4)

In claim No. 4, petitioner alleges that he was denied his constitutional rights to due

process and a fair trial when the trial court improperly admitted into evidence two scraps of

paper found in Godinez's apartment which purportedly showed "pay/owe" information regarding

drug transactions.  Pet. at 5C.  Petitioner argues that the documents "suffered from hearsay and

foundational defects" and that their admission into evidence violated his right to a fair trial.  *Id.*

As described above, petitioner did not raise on direct appeal a federal due process claim

in connection with the admission of the "pay/owe sheets."[11]  On petition for review, petitioner

claimed that the admission of this evidence violated his right to due process because it "allowed

the prosecution expert witness to opine the paper scraps were a drug dealer's 'pay and owe

sheets,' and to further extrapolate that Godinez was a large scale drug dealer handling thousands

of dollars in cash, thereby unfairly supplying the prosecution with a motive for the burglary and

robbery charged as special circumstances."  Answer filed in Avila habeas, Ex. I at 6.  Petitioner

further argued that the trial court's evidentiary ruling denied him "the structural order of a

criminal trial in compliance with fundamental notions of fairness and due process of law."  *Id.* at

10.

Absent some federal constitutional violation, a violation of state law does not provide a

basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Accordingly, a state

court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders

---

[11]  On direct appeal, petitioner claimed that the admission of the "pay/owe sheets" violated state evidentiary rules regarding authenticity and hearsay.  Answer, Ex. A at 23.  The California Court of Appeal rejected these arguments, ruling that the sheets of paper were not hearsay because they were not offered to prove the truth of the matter stated therein, and that the evidence was properly authenticated.  Opinion at 36-39.

1  the state proceedings so fundamentally unfair as to violate due process. *Drayden v.*

2  *White*, 232 F.3d 704, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999);

3  *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

4    The "pay/owe sheets" which are the subject of petitioner's claim in this regard are

5  described above in the "factual background" section.  At petitioner's trial, an expert in

6  methamphetamine trafficking testified that he believed these documents were records of drug

7  transactions.  When the prosecution moved the documents into evidence, defendants

8  unsuccessfully objected on the ground that one of the documents had not been properly

9  authenticated.  Opinion at 36.  Petitioner now contends that the admission of this evidence

10  violated his right to a fair trial.

11    Petitioner has failed to demonstrate a federal due process violation under the facts of this

12  case.  As noted by the state appellate court:

13      Since there was no evidence that defendants had seen these
documents, their only relevance was that Godinez was involved in

14  drug transactions.  But Reynoso separately testified that Godinez
had "fronted" him (Reynoso) to sell methamphetamine with a

15  value of $20,000.  This certainly showed that Godinez was
involved in the drug trade in a large way.  Further, . . .  Defendant

16  Cobb's brother, Joseph, told Detective Winton that Avila and
Reynoso had talked about the fact that Godinez was selling drugs.

17  Thus, there was more than enough evidence that Godinez was
selling drugs (or that defendants believed that he was) such that the

18  two pay-owe sheets added little to the other evidence.

19  *Id.* at 39.  As the state appellate court recognized, the evidentiary value of the two sheets of

20  paper found in Godinez's residence was cumulative to other evidence at petitioner's trial

21  indicating that Godinez was a large scale drug dealer.  Accordingly, the admission of this

22  evidence, even if erroneous under state law, could not have had "substantial and injurious effect

23  or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)

24  (habeas petitioners are not entitled to habeas relief based on trial error unless they can establish

25  that the error resulted in "actual prejudice").  Because petitioner has failed to demonstrate that

26  admission of the "pay/owe sheets" rendered his trial fundamentally unfair, he is not entitled to

28

1    relief on this claim.

2    **b.  Statements of Joseph Cobb (Claim No. 5)**

3         Petitioner's next claim is that he was denied his constitutional rights to due process and a

4    fair trial when the trial court admitted into evidence Joseph Cobb's statements to police to the

5    effect that petitioner and his co-defendants knew Godinez was a drug dealer with a large amount

6    of cash.

7         The California Court of Appeal rejected this claim in a reasoned decision.  That court

8    summarized the relevant facts and explained its reasoning as follows:

9              A portion of the videotaped statement made to police by Joseph
               Cobb – defendant Cobb's brother – was played to impeach
10             Joseph's trial testimony that he had never heard defendants discuss
               Godinez, or the fact that Godinez was selling drugs or "balling."
11             During his taped exchange with Detective Winton, however,
               Joseph had stated that "they" told him Godinez was selling drugs
12             and had money.

13             Over defendants' objection, the trial court instructed the jury that it
               could consider Joseph's statement for the purpose of drawing an
14             inference regarding the state of mind of the persons referred to as
               "they."
15
               Avila contends that "the statement provided the only other
16             evidence from which the jury could have drawn the inference that
               [defendant's] motive in going to Godinez's house was to rob him"
17             and that "there was an insufficient foundational basis to sustain a
               finding that [defendant] was the person who gossiped about
18             Godinez, or that [defendant] heard this gossip and 'adopted' it."
               He argues that nowhere "does Winton or Joseph Cobb define or
19             name who the 'they' were that this conversation referred to."
               Defendant Reynoso joins in this argument.
20
               After reviewing with care the videotape of Joseph's interview with
21             Detective Winton, we disagree with defendants' argument.
               Although some portions are hard to hear, the following exchange is
22             clearly audible.[12]

23             "WINTON:  You think David [Reynoso] and Cruz [Avila] would
               go out and do something like this on their own?  Think of this
24             whole thing by themselves?  Have no contact with anybody else

25    ───────────────────

26    [12]  The parties stipulated that the court reporter did not have to transcribe the tape as it
      played, and no transcript of this tape was introduced into evidence.

about it?

"JOSEPH:  Well, you know, [unintelligible] *they* probably told me about it before, but not that night.

"WINTON:  What would *they* have told you before.

"JOSEPH:  I don't know.  [Unintelligible.]

"WINTON:  What did they tell you, Joe?

"JOSEPH:  *Just talk about Nick.*

"WINTON:  What about Nick?

"JOSEPH:  You know, just, he was, I guess, he was balling or whatever . . . .

"JOSEPH:  In don't know, you know, I knew Nick, *they just told me he was selling drugs* and that was it.  He was big and shit.

"WINTON:  He was big into meth?

"JOSEPH:  I believe so.

"WINTON:  When, when were *they* talking to you about that?

"JOSEPH:  A while ago, when we were kicking at Fred's house or whatever.  'He's balling,' you know what I'm saying?

"WINTON:  Come on, Joe . . . .

"WINTON:  [Unintelligible.]  *Did Kristina say he was dealing?*

"JOSEPH:  *Yeah.*  She told Gume and everything when we were there."  (Italics added.)

Accordingly, it is clear that Detective Winton was questioning Joseph about Reynoso and Avila, and that Joseph's reference to "they" referred to "them."  Defendants' assignment of error is wholly based upon their mistaken assertion that Detective Winton did not preface his questioning of Joseph by asking, "You think David and Cruz would go out and do something like that on their own?"

But a close review of the videotape reveals that Detective Winton prefaced this line of questioning with an express reference to defendants Avila and Reynoso.  We presume this fact was also clear to the trial court and jurors.

////

30

Moreover, Joseph admitted at trial that he understood Detective
Winton was talking about Reynoso and Cruz:

"Q. (By [the prosecutor]):  You understood, didn't you, Mr. Cobb,
that Mr. Winton was – Detective Winton was talking to you about
David Reynoso and about Cruz Avila, correct?

"A.  Guess so."

Under the circumstances, the jurors were entitled to conclude that
Avila and Reynoso were the "they" of whom Winton and Joseph
spoke during their ensuing two-minute exchange.  Defendants'
contention to the contrary has no merit.

Opinion at 39-42.

In the petition before this court, petitioner argues that the statements made by Joseph

Cobb "lacked sufficient foundational basis to sustain a finding that petitioner heard this gossip

[about Godinez] and 'adopted it.'"  Pet. at 5D.  Similarly, he argues that there was insufficient

evidence "that petitioner made the statement that Godinez was 'balling' or accepted it as an

adoptive admission when someone else uttered the statement in front of him."  *Id.*  Petitioner

also contends that Joseph Cobb testified at trial that he was not referring to petitioner and Avila

when he used the word "they" in the police interview, but instead was referring to "other

unspecified people."  *Id.* at 5E.

When asked at trial about his use of the word "they" during his conversation with

Detective Winton, Joseph Cobb gave the following answers:

Q. (By Mr. Johnson (the prosecutor)):  You understood, didn't
you, Mr. Cobb, that Mr. Winton was – Detective Winton was
talking to you about David Reynoso and about Cruz Avila,
correct?

A.  Guess so.

Q.  When you were using the word "they" were you referring to
Cruz and David?

A.  I was referring to the people who we were talking with.  Says
that, you know, we would kick it at Fred's.  There was a lot of
people there.

Reporter's Transcript on Appeal (RT) at 1474.

> Q:  You said on the tape that "they" just told me he was selling drugs.
>
> A.  Ahum.
>
> Q.  Who were you talking about when you say "they"?
>
> A.  People who I was having conversations with.
>
> Q.  At Fred's house?
>
> A.  Yes.
>
> Q.  Who is "they"?
>
> A.  There was a lot of people there.  I mean, you know, everyone has – everyone says things.  I can't remember.

*Id.* at 1476.[13]  Joseph Cobb also testified that he was present, along with petitioner, Avila, and others during conversations about Godinez.  *Id.* at 1475-1476.  Cobb also acknowledged at trial that he told Detective Winton that Kristina told her friend Gumecinda in front of a group that included petitioner and Avila that Godinez was dealing drugs.  *Id.* at 1485-87.

Petitioner does not dispute the appellate court's factual finding that immediately before using the pronoun "they" Detective Winton was asking Joseph Cobb specifically about petitioner and co-defendant Avila.  When read in its entirety, the exchange between Detective Winton and Joseph Cobb makes clear that Joseph Cobb was referring to petitioner and Avila when he said that "they" told Cobb that Godinez was selling drugs and was "big."  In addition, contrary to petitioner's claim, Joseph Cobb did not testify at trial that "they" referred to persons other than petitioner and Avila.  Rather, he testified that "they" may have included persons in addition to petitioner and Avila.

*////*

---

[13]   During a conversation about the admissibility of the tape recording of Joseph Cobb's police interview, the trial judge found that Joseph Cobb was "being deliberately evasive" with regard to the meaning of the word "they" and/or whether Joseph Cobb had heard petitioner or Avila discussing the fact that Godinez was a successful drug dealer.  *Id.* at 1481.

The trial court's decision to admit into evidence the transcript of Joseph Cobb's interrogation and to instruct the jury that the interrogation was relevant to show the state of mind of the persons referred to as "they" did not render petitioner's trial fundamentally unfair.  Upon review of the record, the meaning of Joseph Cobb's reference to "they" was clear from the context.  It is apparent from the record that Joseph Cobb discussed with petitioner and Avila, and possibly others as well, that Godinez was a successful drug dealer.  Petitioner's claim, which is based on an incorrect or incomplete reading of the conversation between Detective Winton and Joseph Cobb and Cobb's trial testimony, lacks merit, is not colorable, and should be denied.

### 4.  Prosecutorial Misconduct (Claim No. 6)

In claim No. 6, petitioner alleges that he was denied his constitutional right to a fair trial when the prosecutor committed misconduct during closing argument.  Pet. at 5E.  Specifically, petitioner argues that, despite his promise not to do so, the prosecutor improperly pointed out to the jury that petitioner had not testified to the same story his trial counsel had described in his opening argument.  *Id.*  In other words, petitioner alleges that the prosecutor improperly highlighted the fact that petitioner's story had changed during the course of the trial.  The California Court of Appeal explained the relevant background to this claim as follows:

> In his opening statement, Reynoso's attorney indicated that ths evidence would show that Godinez summoned Reynoso to his house on the night of the murder.  Although Reynoso "wasn't sure exactly" why Godinez wanted to talk to him, he anticipated a "problem," and he had some ideas or theories about what the problem could be.  Reynoso's attorney then mentioned Reynoso's "prior relationship with [Kristina] Ramirez" and the fact that Reynoso and Kristina had recently encountered each other in social situations – although he did not say Reynoso believed that his prior relationship with Kristina was the source of his problem with Godinez.  Reynoso's attorney said that the evidence would show that even after Reynoso arrived at Godinez's house and saw that Godinez was angry with him, Reynoso did not know why Godinez was upset.
>
> However, Reynoso subsequently testified that he knew Godinez wanted him to come over "to discuss the problem [they] had with the money," and that Godinez thought Reynoso was "ripping him off with a bunch of money from the drugs" that Godinez had

33

previously given Reynoso to sell.

During his cross-examination of Reynoso, the prosecutor asked Reynoso whether he had "change[d] the reason . . . [he was] at Mr. Godinez' house" during the course of the trial.  The trial court overruled Avila's and Reynoso's objection that the question was "improper impeachment."

During a subsequent bench conference, the trial court opined that any prejudice from the question could be cured by an admonition. Reynoso's attorney then moved for a mistrial on the grounds that any argument by the prosecutor that Reynoso had deviated from his anticipated testimony, as characterized by counsel in his opening statement, would invade the attorney-client privilege as to what Reynoso told his attorney and would force counsel to testify. The trial court denied the motion on the ground (among others) that Reynoso's trial testimony did not directly contradict the description of the anticipated testimony made in opening argument.  Moreover, although the prosecutor had indicated that he did not intend to argue that "Mr. Reynoso has changed his story from what he told [his defense counsel] originally," the court opined that it would not be misconduct for him to probe Reynoso during cross-examination or to question him "about changing the story or making a new story."

In his final closing argument, the prosecutor argued, without objection that following Joseph Cobb's testimony, Reynoso "ran out of reasons to be in [Godinez's] house lawfully"; accordingly, he concocted the story that he had gone to see Godinez that night to discuss a longstanding drug-related debt:

"This case didn't begin with Mr. Reynoso's lawyer saying David Reynoso is going to tell you that there was a drug deal, that he owed money.

"This case began with Kristina Ramirez and David Reynoso had a relationship, and the clear implication from the beginning of the case was that Mr. Reynoso was there over some beef with Kristina Ramirez.

"And then what happened was, with each witness, I tried to ask him . . . was there anything going on between these two?  No.  No. No.

"So, the, the left turn was taken into narcotics use.

"Don't blame [Avila's counsel] Mr. Samuel.  He is what he is, by his own words, just an advocate for Mr. Avila.  Do not blame Mr. Herrera [Reynoso's counsel].  These are two men with integrity

34

1          who are operating within the law.

2          "But they are only arguing.  They can only do what they have
           before them.

3
           "Mr. Reynoso makes decisions about whether he will testify.  He
4          chose to testify, and when he did, he's the one that fit himself in
           that small little crawl space of how he could get in that house
5          lawfully."

6     Opinion at 52-54.

7          The state appellate court concluded that petitioner had waived his claim of prosecutorial

8     misconduct because of his failure to object to the prosecutor's closing argument at trial.  *Id.* at

9     55-57.  The court also concluded that any error was not prejudicial, reasoning as follows:

10         Secondly, "[t]o prevail on a claim of prosecutorial misconduct
           based on remarks to the jury, the defendant must show a
11         reasonable likelihood the jury understood or applied the
           complained-of comments in an improper or erroneous manner.
12         [Citations.]  In conducting this inquiry, we 'do not lightly infer'
           that the jury drew the most damaging rather than the least
13         damaging meaning from the prosecutor's statements.  [Citation.]"
           (*People v. Frye, supra,* 18 Cal.4th at p. 970; *see also People v.*
14         *Samayoa, supra,* 15 Cal.4th at p. 841.)

15         Acceptance of Reynoso's claim of misconduct would require that
           we conclude that the jury would have treated the statements in
16         Reynoso's opening statement as "facts" to be measured against
           other evidence for a discrepancy.  Again, the jury was repeatedly
17         advised that statements of counsel are not evidence.  Accordingly,
           we decline to infer that the jurors would have treated them as such.

18

19
           (*People v. McLain* (1988) 46 Cal.3d 97, 119-120 [jurors are
20         presumed to follow the court's instructions].)

21         Because Reynoso waived his objection and has not demonstrated
           that it is reasonably likely the jurors erroneously disregarded the
22         instructions not to treat counsel's statements as evidence, he
           cannot prevail on this claim, even assuming misconduct – an issue
23         we need to (sic) reach.

24    *Id.* at 56-57.

25         A criminal defendant's due process rights are violated when a prosecutor's misconduct

26    renders a trial fundamentally unfair.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

                                            35

1   However, such misconduct does not, per se, violate a petitioner's constitutional rights.  *Jeffries v.*

2   *Blodgett,* 5 F.3d 1180, 1191 (9th Cir. 1993) (citing *Darden,* 477 U.S. at 181, and *Campbell v.*

3   *Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Claims of prosecutorial misconduct are

4   reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's

5   [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due

6   process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).  *See also*

7   *Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974);

8   *Turner v Calderon*, 281 F.3d 851, 868 (9th Cir. 2002).  Relief on such claims is limited to cases

9   in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice.

10  *Johnson*, 63 F.3d at 930 (citing *Brecht*, 507 U.S. at 637-38); *see also Darden*, 477 U.S. at 181-

11  83; *Turner*, 281 F.3d at 868.  Put another way, prosecutorial misconduct violates due process

12  when it has a substantial and injurious effect or influence in determining the jury's verdict.  *See*

13  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).  Finally, it is the petitioner's burden

14  to state facts that point to a real possibility of constitutional error in this regard.  *See O'Bremski*

15  *v. Maass*, 915 F.2d 418, 420 (9th Cir. 1990).

16      In considering claims of prosecutorial misconduct involving allegations of improper

17  argument the court is to examine the likely effect of the statements in the context in

18  which they were made and determine whether the comments so infected the trial with unfairness

19  as to render the resulting conviction a denial of due process.  *Turner*, 281 F.3d at 868; *Sandoval*

20  *v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2001); *see also Donnelly*, 416 U.S. at 643; *Darden*, 477

21  U.S. at 181-83.   Thus, in order to determine whether a prosecutor engaged in misconduct in

22  closing argument, it is necessary to examine the entire proceedings to place the remarks in

23  context.  *See United States v. Robinson*, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment must

24  be examined in context. . . .");  *Greer*, 483 U.S. at 765-66; *Williams v. Borg*, 139 F.3d 737, 745

25  (9th Cir. 1998).

26  ////

36

1    Petitioner has failed to demonstrate that the prosecutor's comments in his closing

2  argument violated his right to due process.  It was apparent from the trial proceedings that

3  petitioner's testimony as to why he went to Godinez's house differed from the reason expressed

4  by his counsel during opening argument.  Reminding the jury of the obvious did not render

5  petitioner's trial fundamentally unfair.  In addition, petitioner's counsel raised no objection to the

6  prosecutor's closing remarks.  This fact, while not dispositive, is relevant to an assessment of

7  fundamental unfairness.  Apparently, even petitioner's counsel did not perceive any undue

8  impropriety in the prosecutor's remarks.  Accordingly, for all of these reasons, petitioner is not

9  entitled to relief on this claim.

10              **5.  Cumulative Error (Claim No. 7)**

11    Petitioner claims, in claim No. 7,  that the cumulative effect of all the errors at his trial

12  violated his due process right to a fair trial.  Pet. at 5F.

13    The Due Process Clause of the Fourteenth Amendment encompasses the right to a fair

14  trial.  *In re Murchison*, 349 U.S. 133, 136 (1955).  However, as the United States Supreme Court

15  stated in *Rose v. Clark*:

16            The thrust of the many constitutional rules governing the conduct
           of criminal trials is to ensure that those trials lead to fair and
17           correct judgments.  Where a reviewing court can find that the
           record developed at trial establishes guilt beyond a reasonable
18           doubt, the interest in fairness has been satisfied and the judgment
           should be affirmed.  As we have repeatedly stated, "*the*
19           *Constitution entitles a criminal defendant to a fair trial, not a*
           *perfect one.*"

20

21  478 U.S. 570, 579 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986))

22  (emphasis added).

23    This court has addressed each of the issues raised in the pending petition and concludes

24  that they did not render petitioner's trial fundamentally unfair, either individually or in the

25  aggregate.  Moreover, the United States Supreme Court has not articulated a claim of

26  ////

                                37

"cumulative error."[14]  Accordingly, any decision by the California courts with respect to this claim is not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.  *See Stevenson v. Lewis*, 384 F.3d 1069, 1071 (9th Cir. 2004) (state court's decision not contrary to federal law where no United States Supreme Court precedent exists).

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  March 5, 2007.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

[14]  The Ninth Circuit Court of Appeals has stated that where "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996).  *See also Karis v. Calderon*,  283 F.3d 1117, 1132 (9th Cir. 2002).